IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JAMIE R. LEIFKER and
CATARI A. LEIFKER,

                Plaintiffs,

v.

LEIFKER GRAIN, LLC,
ROBERT J. LEIFKER, and
RITA M. LEIFKER,

                Defendants.

FINDINGS OF FACT &
CONCLUSIONS OF LAW

15-cv-37-jdp

---

The case requires the court to value and divide a family farming business. Plaintiffs Jamie R. Leifker and Catari A. Leifker had been raising corn and soybeans with Jamie's parents, defendants Robert J. Leifker and Rita M. Leifker. The farming operation was run through a set of limited liability companies, the two most important of which were Leifker Grain, LLC, and Leifker Farms, LLC. The basic idea was that Leifker Farms would grow corn and soybeans under contracts to Leifker Grain, and Leifker Grain would own the crops and market them to take advantage of commodity market conditions. In 2014, a family conflict led Jamie and Catari to formally withdraw from Leifker Grain, in which they owned a 45 percent interest. Jamie and Catari filed this suit to recover the fair value of their share of Leifker Grain, as provided in Chapter 183 of the Wisconsin Statutes, which governs limited liability companies.

The parties agree that the fair value of Leifker Grain is its net asset value, which simply means the value of its assets less the amount of its liabilities. But they sharply dispute that value: Jamie and Catari contend that their share is worth $1,572,194; Robert and Rita contend that it is $252,053.

The case proceeded to a bench trial. This opinion sets forth the court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52. The court concludes that plaintiffs are entitled to monetary judgment in the amount of $1,496,646.90.

BACKGROUND AND PRELIMINARY RULINGS

Jamie and Catari seek the fair value of their shares in Leifker Grain. Leifker Grain is an LLC organized under Wisconsin law, so Wisconsin law governs the parties' dispute. Chapter 183 of the Wisconsin Statutes governs rights and obligations of an LLC and its members unless the parties' operating agreement states otherwise. *See Gottsacker v. Monnier*, 2005 WI 69, ¶¶ 14-19, 45, 281 Wis. 2d 361, 697 N.W.2d 436. The parties agree that their operating agreement did not modify their rights and obligations, so Chapter 183 applies.

Under Wis. Stat. § 183.0604, disassociating members of an LLC are entitled to a distribution for the "fair value" of their shares. Once a member "becomes entitled to receive a distribution," that member has the status of a creditor and is entitled to all remedies available to a creditor. Wis. Stat. § 183.0606. A claim arising under Chapter 183 may be enforced against the LLC itself and, if its assets have been liquidated, against members to whom the assets have been distributed in liquidation. Wis. Stat. § 183.0909. Here, the parties agree that Jamie and Catari are entitled to the "fair value" of their shares.

A. Valuation date

Chapter 183 does not provide a method to determine an LLC's fair value, but the parties agree that the appropriate method here is the "net asset approach." Under this approach, Leifker Grain' value is equal to the value of its assets less the amount of its liabilities.

Robert and Rita contend that Leifker Grain should be valued as of the date of the liquidation of its assets. They contend, essentially, that the liquidation value is fair because Jamie and Catari caused the liquidation by withdrawing from the LLC, and that it would be fair to use the liquidation value because that is what Robert and Rita actually got for the assets. The argument has some equitable appeal, although there are also countervailing equitable arguments, too. But the equities do not matter when the statute is clear. Under Wis. Stat. § 183.0604, the dissociating members are entitled to the fair value of their share "as of the date of dissociation." The parties agree that the date of dissociation is January 16, 2015, and the court will use that date as the valuation date.

**B.  Testimony of Rita Leifker**

Robert and Rita's main challenge to the valuation of Leifker Grain was presented through Rita, who testified extensively about Grain's accounting practices and records. Rita presented what was essentially a forensic analysis of the books of both Leifker Grain and Leifker Farms. She testified that Leifker Grain's accounting practices were shoddy, that Jamie and Catari's expert overlooked various liabilities of Leifker Grain, and that Jamie and Catari actually owe Leifker Grain certain sums of monies because Leifker Grain had paid for their personal expenses. Jamie and Catari objected to Rita's testimony repeatedly throughout the trial. Tr. 1a, at 17:5-16; Tr. 1p, at 81:15-82:10, 121:24-122:12; Tr. 2a, at 122:24-123:19. The court heard Rita's testimony, but deferred ruling on its admissibility until now. The court will exclude Rita's testimony on the accounting matters for two basic reasons.

First, Rita's testimony about the finances and accounting of the two limited liability companies is an expert analysis that was not properly disclosed in an expert report under Fed. R. Civ. P. 26(a)(2). The court already ruled that Robert and Rita's expert, Ron Helle,

3

had not timely disclosed his opinions and that Robert and Rita would not be allowed to present expert opinion at trial. Dkt. 18. Defendants cannot circumvent this ruling by having Rita provide their expert analysis at trial. *See Compania Administradora de Recuperacion de Activos Administradora de Fondos de Inversion Sociedad Anonima v. Titan Int'l., Inc.*, 533 F.3d 555, 560-61 (7th Cir. 2008).

Second, even if Rita were testifying in some capacity other than an expert, her testimony and the exhibits on which she relied were not timely disclosed. *See Whitfield v. Int'l Truck & Engine Corp.*, 755 F.3d 438, 447 (7th Cir. 2014). Rita was never disclosed as a witness with knowledge of Leifker Grain's finances. In fact, Rita testified at her deposition that she had "nothing to do with" Leifker Grain. Tr. 2a, at 122:24-123:19.

Defendants also failed to timely disclose the exhibits on which Rita relied. For example, at trial they sought to introduce Defense Exhibit No. 510, an 184-page document showing crop prices, but they had not produced the document during discovery, and Jamie and Catari saw it for the first time one week before the trial. There are other examples. *See, e.g.*, Defense Exhibit Nos. 550 through 555.[1] Jamie and Catari had no meaningful opportunity to examine the documents before Rita's deposition or before the trial. The court will not consider these documents.

Defendants argued at the final pretrial conference that Rita should be allowed to testify as a business owner, under the general rule that an owner of property can testify to its value. *Trible v. Tower Ins. Co.*, 43 Wis. 2d 172, 186 (1969). But that general rule does not overcome Robert and Rita's failure to timely disclose Rita as a witness with knowledge of the

---

[1] The cover page of each of these exhibits shows that Rita Leifker prepared these exhibits in August 2016. The end of discovery was May 2016. Thus, defendants could not have produced these documents to plaintiffs during discovery.

business. *See* Fed. R. Civ. P. 26(a)(1)(A)(i). And Rita's testimony was not based on her knowledge as an owner of the business (she disavowed that), rather it was based on her own forensic analysis of the books of the two LLCs (as coached by counsel and defendants' disqualified expert, Heller).

FINDINGS OF FACT

**A. Background: Leifker family business**

Robert and Rita Leifker farmed for decades, first through a sole proprietorship and later through a limited liability company. Robert and Rita are domiciled in Wisconsin. Plaintiffs Jamie and Catari are domiciled in Iowa.

In 2012, Robert attended an estate planning program, which led to his engagement of a lawyer who restructured the farming operation into six limited liability companies. Three LLCs held parcels of land on which the Leifkers farmed; Leifker Storage held a grain storage facility; Leifker Farms raised corn and soybeans under contract with Leifker Grain, which would own the crops and market them. One purpose of the restructuring was to insulate the Leifkers's assets from tort claims that might arise from the farming and storage operations. Leifker Farms and Leifker Grain were owned 45 percent by Jamie and Catari and 55 percent by The Leifker Family Trust, whose sole trustees and beneficiaries are Robert and Rita. Jamie and Catari had a right to recover, upon withdrawing, the value of their shares in Leifker Grain, but not for their shares in Leifker Farms.

By the time that matters here, after 2012, Jamie was running the business operation in consultation with Robert, and Catari did the books with Jamie's help. Rita had little to do with the farm; she worked at John Deere until her retirement in 2014.

When Rita retired, she asked to be more involved in the management of Leifker Grain and Leifker Farms, and she wanted to review the books. Jamie and Catari resisted; Robert and Rita filed suit in Iowa State Court to gain access to the books. Relations between Robert and Rita on one side and Jamie and Catari on the other deteriorated. Ultimately, Robert and Rita decided to remove Jamie as co-manager of Leifker Farms on September 15, 2014. Jamie and Catari withdrew from Leifker Grain on January 16, 2015.

**B. Value of Leifker Grain**

The starting point of the court's findings of fact is the report of the only expert witness in this case: Jane M. Tereba, CPA. Tereba reviewed Leifker Grain's historical financial statements, including income statements, balance sheets, tax returns, and the underlying documents that support those statements. She considered various valuation methods, but she settled on using the net asset approach. The parties do not dispute Tereba's valuation method; they dispute only the values of individual balance-sheet items and the total value of Leifker Grain.

The court finds that the total value of Leifker Grain's assets as of the date of Jamie and Catari's disassociation is $5,142,707 and that the total value of its liabilities is $1,816,825. This leaves $3,325,882 as the value of Leifker Grain's net equity, and Jamie and Catari are entitled to 45 percent of it, which is $ 1,496,646.90. The values of individual assets and liabilities are as follows:

| Assets | |
|---|---:|
| Cash | 955,110.00 |
| Crops and feed on hand (2014) | 3,420,148.00 |
| Crops and feed on hand (2013) | 15,640.00 |
| Prepaid expenses | 542,000.00 |
| Hedge Account | 3,110.00 |
| Prepaid marketing | 10,969.00 |

|  |  |
|---|---:|
| Inventory - Chemicals | 25,540.00 |
| Reimbursement due | 13,500.00 |
| Open contracts | 156,690.00 |
| Net assets | 5,142,707.00 |
| **Liabilities** | |
| Operating Note | 1,763,000.00 |
| Tony Polfer's bonus | 53,825.00 |
| Net liabilities | 1,816,825.00 |
| | |
| Net equity | 3,325,882.00 |
| Plaintiffs' damages | 1,496,646.90 |

1. **Cash**

The court finds the value of Leifker Grain's cash as of January 16, 2015, to be $955,110.

According to Jamie and Catari, Leifker Grain had cash in the amount of $970,428 as of December 31, 2014. Tr. 1a, at 38:22-24; *see also* Defense Exhibit No. 503. But this does not establish the cash balance as of January 16, 2015. Leifker Grain had four outstanding checks that had not cleared as of December 31, 2014. Three of the four checks were written to purchase assets (fertilizer, pesticides, cattle, for Leifker Grain), so the discrepancy between the cash amount on December 31, 2014, and the one on January 16, 2015, did not affect Leifker Grain's net equity. Tr. 1a, 39:3-23; Dkt. 34, at 7, 9. But the remaining check in the amount of $15,318 was not written to purchase an asset. Rather, it was written to compensate a Leifker Grain employee, Tony Polfer. *See* Defense Exhibit No. 504. Accordingly, the court will reduce Leifker Grain's cash amount by $15,318, resulting in the amount of $955,110.

2. **Crops and feed on hand (2013 and 2014)**

These line items on Leifker Grain's balance sheet represent inventories of crops gathered, but not yet delivered to buyers. "Crops and feed on hand (2013)" represents the

7

value of crops gathered in 2013, and "Crops and feed on hand (2014)," represents the value of crops gathered in 2014. The court finds that the value of crops from 2013 is $15,640 and that the value of crops from 2014 is $3,420,148.[2]

As for the crops from 2013, Leifker Grain had 4,000 bushels of corn. Each bushel was valued at $3.91, which was the futures price as of January 16, 2015. This futures price represents the price that Leifker Grain could obtain on January 16, 2015, for delivery in July 2015 through a futures contract. Jamie testified that the most profitable time to deliver corn was in July and that the demand for corn was low in January. For that reason, it was customary for Leifker Grain to contract for futures prices for July delivery. Tr. at 1a, 92:10-93:7.

As for the crops from 2014, Leifker Grain had 611,585 bushels of corn. Of these bushels, 360,000 were already contracted for $5.30 for each bushel, meaning that they were already sold and the price for each bushel was determined. The remaining 251,585 bushels were not sold, and they were valued, again, at $3.91, the futures price of corn as of January 16, 2015, for July 2015 delivery. Leifker Grain also had 51,078 bushels of soybeans, which were all already contracted for $10.58 per bushel. These figures actually add up to $3,432,102.59, not $3,420,148 as Jamie and Catari presented at trial, but the court infers from the parties' testimony at trial that costs and other items reduce the value, resulting in the amount of $3,420,148.

Robert and Rita contend that for the uncontracted corn, a spot price, rather than a futures price, should be applied. *See, e.g.*, Dkt. 34, at 7-8. They argue that because Cargill, one

---

[2] Although the label "Crops and feed on hand" suggests that there is some animal feed, the parties do not indicate that Grain had any as of January 2015.

of Leifker Grain's buyers, placed a bid for $3.68 per bushel, the appropriate value is $3.68, not $3.91. But their view is not supported by the testimony of an expert. Besides, they do not dispute that Leifker Grain could enter into futures contracts for $3.91, so Leifker Grain had no reason to accept Cargill's bid for a lower price when it could enter into futures contracts for a more profitable rate. Thus, the court will decline to adopt Robert and Rita's proposed finding.

    **3. Open contracts**

This line item represents the difference between the contracted price for transactions already secured and the market price. For example, if Leifker Grain secures a contract for a certain crop at $5 and the current price is at $4, that contract would have the value of the spread, $1. Tr. at 1b, 22:16-23:10. The court finds that, as of January 16, 2015, Leifker Grain had open contracts valued at $156,690. This amount reflects an exit penalty of 10 cents per bushel, which is the amount that Leifker Grain would have paid if it transferred the open contracts to another party.

Robert and Rita contend that the exit penalty should be 25 cents per bushel, which is the amount that Leifker Grain would pay if it were to cancel these open contracts, rather than transferring them to another party. The court again declines to adopt their proposed finding and instead accepts Jamie and Catari's proposal. Jamie and Catari's expert testified that the intent of these open contracts was not to cancel them and that because Leifker Grain would continue to operate beyond January 16, 2015, the expert chose 10 cents per bushel instead of 25 cents per bushel for the exit penalty. Tr. 1a, 74:10-20.

### 4. Tony Polfer's bonus and payroll tax

Jamie testified at trial that he and his wife had not accounted for a bonus accrued by Polfer because Polfer had quit in November 2014. But the testimony of Jamie, Tony, Rita, and Robert made clear that Jamie did not have the sole discretion to decide how much to pay Leifker Grain's employees. Robert, too, was a manager of Leifker Grain, who had some say in that decision. The court finds that Robert made the decision to pay Polfer his bonus before Jamie and Catari's withdrawal. The amount of bonus advocated by Robert and Rita is $50,000. This is the lowest amount that Polfer had received in the past. The associated payroll tax for this bonus is $3,825, making the total $53,825. This is a separate amount from the $15,318 check discussed above for Polfer's compensation. Accordingly, the court finds that Leifker Grain had accrued liability for an unpaid bonus for Polfer in the amount of $53,825 as of January 16, 2015.

### 5. Other liabilities

Robert and Rita presented evidence at trial that purported to show that Leifker Grain had other liabilities, particularly to Leifker Farms. The court declines to find additional liabilities for two reasons. First, Robert and Rita sought to introduce their evidence through Rita's testimony, but for reasons noted above, the court will not consider Rita's testimony on accounting matters.

Second, even if the court were to consider the evidence presented through Rita, the evidence does not support Robert and Rita's theories. For example, they contend that Leifker Grain had an outstanding liability for custom hire payments in the amount of $469,664. This is the amount, according to Robert and Rita, that Leifker Grain had underpaid Farms for various farming services. In support of this theory, they present Rita's testimony that she

10

had gone through every bank statement from 2012 to 2014 and identified underpayment from Leifker Grain over those years. Tr. 2a, at 47:22-48:5. But those bank statements do not show that Leifker Grain owes Leifker Farms any payment. Those bank statements are, like balances sheets, snapshots of financial conditions: the fact that a cash balance in Leifker Farms' bank statement changed from one date to another does not show that Leifker Grain owes Leifker Farms for the amount of the difference. To reach that conclusion, the court would need to know the nature of the underlying transaction that caused that balance to change. But Rita made clear during the trial that she did not know the nature of the underlying transactions.

Likewise, Robert and Rita sought to introduce Defense Exhibit No. 537, which is, according to Rita, a summary of "loans" made by Farms to Leifker Grain. This document is the source of their conclusion that Leifker Grain owes Farms $825,992. Tr. 2a, at 56:16-20. Robert and Rita argue that the "only explanation for any portion of this debt" is that Jamie and Catari improperly categorized these loans as capital contributions. Dkt. 34, at 11. They argue that their own son Jamie schemed to defraud them by transferring assets from Leifker Farms, from which Jamie had no right of withdrawal, to Leifker Grain, from which he did.

The court finds Robert and Rita's accusations unsubstantiated and not credible. Robert and Rita adduced no documentary evidence concerning the purposes or capitalization of the six-LLC structure of their farming operation. But the impetus for the six-LLC structure was not Jamie; it was Robert, although Robert could not recall the purpose of it. And plaintiffs offered a plausible explanation for moving assets to Leifker Grain: Leifker Farms and Leifker Storage were operating entities that would more likely give rise to tort claims that could put the Leifker's assets at risk. To be sure, the bookkeeping for Leifker Grain and

11

Leifker Farms was erratic. But sloppy bookkeeping does not equate to the kind of fraud and deception that Robert and Rita allege. And of course, Robert and Rita have a mirror-image motive to diminish the value of Leifker Grain: every dollar that they pull back to Leifker Farms is a dollar that they do not have to share with Jamie and Catari.

Nor does defense Exhibit No. 537 support Robert and Rita's theory. Rita prepared the exhibit based on a collection of bank statements from Dubuque Bank and Trust Company on Farms' and Leifker Grain's lines of credit. Robert and Rita's view is that the changes in the balances in two companies' lines of credit show that one company owes the other payment. But again, the court will not conclude that Leifker Grain has outstanding liabilities without knowing what caused those balances to change.

The same is true for Defense Exhibits No. 550 through 555. According to Rita, she prepared these exhibits to "prove out" Defense Exhibit No. 528. Tr. 1a, at 104:6-21. Exhibit No. 528 is another summary prepared by Rita Leifker that purports to show that Farms paid various expenses incurred by Leifker Grain, for the total of $469,644.05. But Exhibits No. 550 through 555 are mostly invoices from third party vendors directed at Farms. They do not indicate that Farms was paying these invoices on behalf of Leifker Grain.

CONCLUSIONS OF LAW

The court concludes that it has subject matter jurisdiction on the basis of diversity under 28 U.S.C. § 1332(a). The fair value of Jamie and Catari's shares in Leifker Grain should be valued as of the date of their disassociation, January 16, 2015. Based on the total value of Leifker Grain's assets as of January 16, 2015, $5,142,707 and its liabilities,

$1,816,825, the value of Leifker Grain's net equity is $3,325,882. Jamie and Catari are entitled to monetary judgment in the amount of $1,496,646.90.

ORDER

IT IS ORDERED that:

1. Plaintiffs Jamie R. Leifker and Catari A. Leifker are entitled to monetary judgment in the amount of $1,496,646.90.

2. The clerk of court is directed to enter judgment in favor of plaintiffs and close the case.

Entered March 28, 2017.

                                      BY THE COURT:

                                      /s/

                                      _____
                                      JAMES D. PETERSON
                                      District Judge